UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Castle Aero Florida International, Inc., | Civil No. 11-2672 (PAM/JJG) |
| Plaintiff, | |
| v. | |
| Marketing and Financial Services, Inc., Innovatis Asset Management, S.A., Acre Financial, S.A., Gerry Jackson, and Erwin Lasshofer, | |
| Defendants. | |
| Innovatis Asset Management, S.A., | Civil No. 12-1818 (PAM/JJG) |
| Plaintiff/Counter-Defendant, | |
| and | |
| Erwin Lasshofer, | |
| Counter-Defendant, | |
| v. | |
| Marketing and Financial Services, Inc., Acre Financial, S.A., and Gerry Jackson, | |
| Defendants/Counterclaimants | |
| Castle Aero Florida International, Inc., | |
| Intervenor Defendant, | |
| v. | |
| Innovatis Asset Management, S.A., and Erwin Lasshofer, | |
| Intervenor Plaintiff/Counter Defendants. | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND ORDER FOR JUDGMENT**

The Court held a bench trial in these matters on June 18, 2014. Sonya R. Braunschweig appeared on behalf of Plaintiff/Intervenor Castle Aero Florida International, Inc. Manly A. Zimmerman appeared on behalf of Defendants/Counterclaimants Gerry Jackson and Marketing and Financial Services, Inc. There was no appearance on behalf of Plaintiff/Counter-Defendant Innovatis Asset Management, S.A. or Defendant/Counter-Defendant Erwin Lasshofer. Because of Innovatis's and Lasshofer's failure to appear, the other parties brought Motions for Default and Motions to Dismiss for Lack of Prosecution.

Having heard the arguments of counsel and considered the evidence submitted, the Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT[1]

## I. PROCEDURAL BACKGROUND.

1. Castle Aero initiated its action in September 2011 (the "Castle Aero Action"), after it was unable to obtain the return of a US$4 million Standby Letter of Credit ("SBLC") from Lasshofer and Innovatis (collectively "Lasshofer") or Gerry Jackson and Marketing and Financial Services ("MFS").[2] (Castle Aero Action, Compl. (Docket No. 1).) Castle Aero settled its dispute with Jackson and MFS, and Jackson and MFS were dismissed from the

---

[1] Most of the numerical exhibits referenced here are Castle Aero Trial Exhibits ("CA Ex."). Alphabetical exhibits are attached to the Affidavit of Gerrard Jackson, and all other exhibits are attached to the Affidavit of Sonya R. Braunschweig.

[2] Jackson was the principal and only shareholder of MFS (2014 Jackson Aff. (Docket No. 189) ¶ 1), and throughout this Order the two parties are effectively interchangeable. Similarly, Lasshofer controls Innovatis and those two parties are interchangeable.

action in September 2012.  (Castle Aero Action, Sept. 26, 2012, Order (Docket No. 52).)

2.      Innovatis filed its action against Jackson and MFS in July 2012 (the "Innovatis Action").  (Innovatis Action, Compl. (Docket No. 1).)  Jackson and MFS answered and asserted counterclaims against Innovatis and Lasshofer, and Castle Aero intervened as an Intervenor Defendant.  (Innovatis Action, Am. Answer & Countercl. (Docket No. 14); Intervenor Compl. (Docket No. 15).)

3.      In August 2012, Castle Aero filed a motion to compel against Lasshofer for failing to produce all documents and e-mails reflecting all communications with Jackson and MFS and for failing to produce communications with Liechtensteinische Landesbank ("LLB") and LLB account statements  (Castle Aero Action, Mot. to Compel (Docket No. 37).)  Lasshofer took the position that these documents were not relevant.

4.      On October 10, 2012, the Court granted Castle Aero's motion and ordered Lasshofer to produce the documents. (Castle Aero Action, Oct. 10, 2012, Order (Docket No. 56) at 5.)

5.      In response to the October 2012 Order, Lasshofer produced a portion of the LLB documents in redacted form and refused to provide summary reports of e-mail communications the Court had ordered (the "hit reports").

6.      On December 13, 2012, Castle Aero filed a motion to show cause, again requesting that Lasshofer be compelled to produce the LLB documents and the hit reports. This time, Lasshofer claimed he had produced all of the LLB documents to which he had access.  He failed, however, to produce key documents subsequently uncovered by Castle

3

Aero in the Austrian criminal file,[3] including documents showing that over "$650,000 of funds were paid out of the [LLB] account to Hogan Lovells, a law firm used by [] Lasshofer." (Castle Aero Action, Jan. 4, 2013, Order (Docket No. 77) at 3.)

7.     On January 4, 2013, the Court granted Castle Aero's motion and stated that Lasshofer, as accountholder, was in a position to demand a complete set of records from LLB. The Court ordered Lasshofer "to produce full, unredacted, account statements… [for] every account in which the funds were deposited or transferred . . . ." (Id. at 6.) The Court also ordered that Lasshofer do so by no later than January 25, 2013.

8.     Again, Lasshofer failed to comply with the Court's Orders, forcing Castle Aero to file another motion to compel on February 28, 2013. (Docket No. 78.) Lasshofer took the position that he had nothing more to produce.

9.     The Court disagreed, concluding that Lasshofer had produced only a small subset of the required documents—he produced account statements for only six accounts instead of fourteen, the account statements lacked transactional detail, and Lasshofer had limited the production to documents after November 1, 2011, "although there was no temporal limitation in the Court's discovery orders." (Castle Aero Action, Apr. 5, 2013, Order (Docket No. 89) at 3.) Concluding that there were "significant gaps" in the documents Lasshofer produced, even though such a task should have been relatively simple, the Court held that Lasshofer had failed to comply with the Court's previous orders and ordered

---

[3] As discussed in more detail below, Lasshofer is facing criminal charges in Austria and is under criminal investigation in several other jurisdictions.

Lasshofer to produce the documents.  (Id. at 4.)  Unconvinced that a third discovery order was enough, the Court appointed a Special Master to oversee the completion of discovery. (Id. at 5.)

10.     The Special Master handled the discovery process from May through August 2013.

11.     It was not until July 2013, in response to the Special Master's Orders, that Lasshofer finally produced the LLB documents along with other relevant documents.  (See Castle Aero Action, June 28, 2013, Special Master Order #2 (Docket No. 99).)  The account statements alone amounted to more than 400 pages of documents.  (CA Ex. 170.)

12.     The account statements were basic banking information that Lasshofer had available by a touch of a button on his computer but clearly did not want to produce.  Not only did Lasshofer's misconduct cost Castle Aero additional, unnecessary legal fees and costs to pursue these key and relevant documents, but it also caused unnecessary delays in trying this case, which the Court had initially set for June 3, 2013.  (Castle Aero Action, Jury Trial Notice (Docket No. 88).)

13.     Lasshofer then sought to delay this matter further by filing a discovery motion with the Special Master months after the deadlines for doing so had expired.  In his motion, Lasshofer sought to reopen discovery that he had failed to pursue within the time limits set by the Court and that had expired more than six months before.  (Castle Aero Action, Motion (Docket No. 111); Innovatis Action, Motion (Docket No. 26).)

14.     Lasshofer also filed a motion to consolidate the two actions for pretrial and trial proceedings.  The Court rejected the request as to pretrial proceedings because it "would only further complicate and delay each action."  (Castle Aero Action, Nov. 1, 2013, Order at 1 (Docket No. 138).)   The Court ordered that the Castle Aero and Innovatis Actions be consolidated for purposes of trial only.  (Id.)

15.     In October 2013, Lasshofer filed a motion for summary judgment (Docket No. 136), which the Court denied.  (Docket No. 149.)  Lasshofer sought reconsideration, which the Court also denied.  (Docket No. 153.)

16.     At the summary-judgment hearing on January 7, 2014, the Court told the parties to be ready for trial in June.  In the summary-judgment Order, the Court also informed Lasshofer that his in-person testimony was required because Lasshofer's credibility was an issue that had to be determined at trial.  (Jan. 14, 2014, Order at 6 (Docket No. 149).)

17.     Lasshofer's personal appearance was an issue because a Colorado federal district court issued a bench warrant against Lasshofer in June 2013 for failing to comply with its orders.  (See id. at 4 (referring to Niemi v. Burgess, Civ. No. 1:12-869 (D. Colo.) (Docket No. 226)).)  Despite notice that his appearance was necessary to the trial of these matters and that trial would be set for June, Lasshofer did nothing to vacate the Colorado bench warrant other than make a short argument in an appellate brief.  Instead, Lasshofer waited until May 7, 2014, to request that the trial in these actions be postponed until three months after the Tenth Circuit ruled on the propriety of the bench warrant.  (Castle Aero Action, Mot. to Postpone Trial (Docket No. 155); Innovatis Action (Docket No. 45).)  On

6

May 8, 2014, this Court set trial of this matter for June 16, 2014, later rescheduled to June 18, 2014.  (Castle Aero Action, Bench Trial Notice (Docket No. 161); Innovatis Action (Docket No. 51).)

18.     This Court denied Lasshofer's request to further postpone the trial because the proceedings had "moved at a glacial pace" "[d]ue largely to Lasshofer's incalcitrance." (Castle Aero Action, May 16, 2014, Order at 2 (Docket No. 165); Innovatis Action (Docket No. 54).)

19.     After this Court denied Lasshofer's request to postpone the trial, Lasshofer did not file any motions in Colorado or the Tenth Circuit.  Instead, Lasshofer waited another week to file a writ of mandamus with the Eighth Circuit, seeking the same relief as he did from this Court.  The Eighth Circuit summarily denied his request.  (Castle Aero Action, Mandate (Docket No. 174); Innovatis Action (Docket No. 63).)

20.     A day later, Lasshofer terminated his counsel.  Lasshofer's counsel filed a motion to withdraw (Castle Aero Action, Mot. to Withdraw (Docket No. 166); Innovatis Action (Docket No. 55)).  In those papers, Lasshofer made clear that he would not seek substitution of counsel or participate in the upcoming trial.  (See Castle Aero Action,  Supp. Mem. at 3 (Docket No. 168); Innovatis Action (Docket No. 57).)

21.     This Court granted the withdrawal motion recognized that this was "not the first evasive maneuver Lasshofer has employed to avoid trial.  Lasshofer has engaged in dilatory conduct throughout this matter . . . [and] now apparently attempts to secure a postponement of trial by terminating his counsel." (Castle Aero Action, June 6, 2014, Order

at 2 (Docket No. 172); Innovatis Action (Docket No. 61).)

22.     Since then, Lasshofer has failed to comply with the Court's pretrial orders, failed to provide contact information, elected not to appoint counsel for Innovatis, and failed to attend trial.

23.     On June 10, 2014, Castle Aero and Jackson served a notice on Lasshofer of their intent to move for default judgment on June 18, 2014.  The notice was served by e-mail to legal@innovatis-organization.com, which is the only contact information provided to Castle Aero's counsel.  (June 16, 2014, Braunschweig Aff. ¶¶ 2-4; Exs. 1-2.)

24.     On June 13, 2014, Castle Aero also served the Court's Second Amended Trial Notice on Lasshofer.  (Id. ¶ 5; Ex. 3.)

25.     On June 16, 2014, Castle Aero, MFS, and Jackson filed a Motion for Dismissal of Claims for Failure to Prosecute and Default Judgment for Failure to Defend.  The Court heard this motion on June 18, 2014, and took evidence in support of the Motion.

26.     The Court finds that Castle Aero, MFS, and Jackson submitted substantial and compelling uncontroverted evidence against Lasshofer and finds that the overwhelming weight of the evidence establishes that Lasshofer engaged in fraudulent conduct, as the following sections demonstrate.

## II.     CASTLE AERO'S PURCHASE OF THE AIRCRAFT.

27.     In 2007, Castle Aero entered into an agreement with Gulfstream to purchase a 2009 Gulfstream Aerospace GIV-X (G450).  (Castle Aero Action, Dec. 20, 2012, Castillo Decl. (Docket No. 73) ¶ 7.)

28.     As the delivery date approached, Castle Aero began investigating financing options for the purchase of the aircraft.  Due to the world-wide economic crisis, Castle Aero was unable to obtain financing in time to close the purchase.  Castle Aero decided to purchase the aircraft outright without financing.  (June 16, 2014, Castillo Decl. (Docket No. 188)  ¶¶ 3-4.)

29.     Castle Aero closed the purchase and took delivery of the aircraft in November 2009.  (2012 Castillo Decl. ¶ 7.)

## III.   CASTLE AERO IS INTRODUCED TO MFS, AND MFS PRESENTS CASTLE AERO WITH A PROPOSED TERM SHEET.

### A.     MFS Is Identified as a Possible Lender to Refinance the Aircraft.

30.     In 2010, Castle Aero again began searching for possible refinancing options for the Aircraft and hoped to obtain US$22 million in refinancing.  (Id. ¶ 8; 2014 Castillo Decl. ¶¶ 4, 6.)

31.     To assist with identifying possible financing options, including conventional financing and private lending financing, Castle Aero engaged the services of Ernesto Pentenero of GP Global Finance.  (2014 Castillo Decl. ¶ 5; June 16, 2014, Pentenero Decl. (Docket No. 191) ¶ 3.)  Alpha Capital Services, a broker located in Delray Beach, Florida, provided brokerage services for the refinancing transaction.  (June 13, 2014, Piloto Decl. (Docket No. 190) ¶ 3.)

32.     MFS was identified as a possible source of funding to refinance the aircraft. (2014 Castillo Decl. ¶ 6; Pentenero Decl. ¶¶ 3-4; Oct. 10, 2013, Pentenero Dep. at 41-43.)

9

### B.   Jackson Presents Castle Aero with a Proposed Term Sheet.

33.    In June 2010, Jackson presented Castle Aero with an "Aircraft Lease/Purchase Term Sheet" ("Term Sheet").  The Term Sheet set forth some of the terms and conditions of an acceptable financing arrangement that were to be incorporated into a final lease agreement to be approved by the parties.  (CA Ex. 62; see also June 12, 2014, Adwar Decl. (Docket No. 185) ¶ 4; 2014 Castillo Decl. ¶ 7; June 13, 2014, Jackson Aff. (Docket No. 189) ¶ 46; Pentenero Decl. ¶ 6.)

34.    Specifically, the Term Sheet states that MFS would provide financing in the amount of US$22 million for a term of 180 months at a fixed interest rate of 7% and that the title of the aircraft would remain with MFS, a Minnesota-based company, as lessor.  (CA Ex. 62; 2014 Jackson Aff. ¶ 47.)

35.    The Term Sheet also provides that Castle Aero would provide a SBLC in the amount of US$4 million to be delivered to MFS's intermediary bank after final approval of the lease and before closing the lease/finance transaction.  The SBLC was a mandatory security deposit under the lease/finance transaction and was only necessary if the transaction closed.  Specifically, the SBLC was purportedly to act as partial security for Castle Aero's obligations under the final definitive lease and was to be used only if Castle Aero materially defaulted on its obligations under that agreement.  (CA Ex. 62; Adwar Decl. ¶ 8; 2014 Castillo Decl. ¶ 10; 2014 Jackson Aff. ¶ 48; Pentenero Decl. ¶¶ 7-8.)  No final definitive lease was ever executed by the parties.  (See CA Exs. 190-92 (drafts of proposed lease); Adwar Decl. ¶ 9.)

10

36.     Even before the parties agreed on the Term Sheet, Jackson immediately and repeatedly pressed Castle Aero to arrange the SBLC.  (CA Exs. 63, 65; 2014 Jackson Aff. Ex. M; Pentenero Decl. ¶¶ 9-10.)  According to Jackson, he needed to immediately obtain the contact information for Castle Aero so that it could be given to Erwin Lasshofer, CEO of Innovatis.  According to Jackson, Lasshofer was the individual who would "arrange the exact wording of the SBLC and get it placed correctly the first time" to ensure it was done properly.  (CA Ex. 63; Jackson Aff. Ex. M.)

37.     When Castle Aero (through Pentenero) asked why it was necessary to use Innovatis on the SBLC, it was told that:

> To help clarify the parties involved in the SBLC we have three firms:
>
> Issuing Bank-TBD-Lessee's bank that will issue the SBLC
> Receiving Bank-Credit Suisse-Lessors [sic] bank that will accept the SBLC
> Intermediary-Innovatis Asset Management.
>
> Innovatis is a licensed dealer that will act as an intermediary between the lessee and lessor.  In the event there is a default Acre Financial (lessor) will go to Innovatis and demonstrate or prove the lease is in default.  Once proof is accepted Innovatis will go to Credit Suisse who will in turn go to the issuing bank and draw the funds.  Funds will then go from the issuing bank to Credit Suisse and then to Innovatis and then to Acre.  Innovatis is in place to protect the lessee from the lessor presenting the SBLC to a bank without good reason.

(CA Ex. 64; 2014 Jackson Aff. ¶ 50; Pentenero Decl. ¶¶ 12-13; see also Armitano Decl. (Docket No. 186) ¶¶ 5-7 (confirming that Pentenero relayed Innovatis's role to him); Oct. 9, 2013, Amitrano Dep. at 65 (Innovatis was to be the "impartial guarantor").)

38.     Castle Aero was therefore led to believe that the use of Lasshofer as intermediary was to protect Castle Aero from the lessor presenting the SBLC "to a bank

without good reason." (CA Ex. 64.)

39.    It is therefore undisputable that Castle Aero was also led to believe, consistent with the Term Sheet, that the SBLC could only be used if there was a material default by Castle Aero under the terms of the final definitive lease. Jackson admits that in his affidavit: "All parties to the transaction understood that the SBLC was to act as partial security that would be used to meet Castle Aero's obligations under the terms of the aircraft leasing agreement. That provision was never changed nor was it ever modified at any point in time, as the drafts of the Aircraft Lease Agreement make clear." (2014 Jackson Aff. ¶ 48; see also Exs. 62, 190-92.)

40.    From the beginning, Lasshofer clearly knew that Castle Aero believed that the SBLC was to act as a security deposit for the leasing transaction and did nothing to inform Castle Aero otherwise.

41.    On August 2, 2010, Lasshofer and Jackson exchanged a number of e-mails regarding the Castle Aero SBLC. These e-mails reveal the scheme to use Castle Aero's SBLC without Castle Aero's knowledge. (CA Exs. 73, 76, 81, 82.)

42.    Initially, the SBLC was to be issued by a Caribbean bank, with Lasshofer purportedly intending to use Credit Suisse as the receiving bank—the bank that would ultimately provide a line of credit against the Castle Aero SBLC. (CA Ex. 67; Armitano Aff. ¶ 8; see also, e.g., CA Ex. 70 (July 28, 2010, email from Lasshofer to Jackson, telling Jackson to negotiate the rate with Credit Suisse for the line of credit as to the Rimal Aviation SBLC).)

43.     Lasshofer's plans had to change, however, when Castle Aero decided to use Credit Suisse to issue the SBLC.  (CA Ex. 71.)  According to Lasshofer, a line of credit could not be obtained from Credit Suisse if Credit Suisse also issued the SBLC—in other words, Credit Suisse would not fund its own SBLCs.  (CA Ex. 72.)  As Lasshofer further explained,

> Credit Suisse is not funding their own securities (**and your client does not know that it becomes funded, but just used as security**).  This means that we have to use one of our other banks we are working with and with which we have standing credit-lines, which we easily can do.

(CA Ex. 73 (emphasis added).)  Lasshofer therefore knew that the Castle Aero SBLC was a security deposit and that Castle Aero had no knowledge the SBLC was going to be used to obtain a line of credit.

44.     On August 2, 2010, the SBLC proposed by Credit Suisse was provided to Lasshofer and Jackson and included a description of goods and services referencing the "[c]ontractual obligations regarding the sale of an airplane Gulfstream G450, Year 2009." (CA Ex. 78.)

45.     Knowing that the inclusion of this provision would make it difficult to pledge the SBLC and obtain a bank line of credit, Lasshofer and Jackson demanded that Castle Aero have the provision removed.   (CA Exs. 79-83.)   Castle Aero was led to believe that mentioning the contractual agreement would violate the nature of the SBLC and turn the lease into a conditional sales agreement, which was not acceptable.  (CA Ex. 82.)  In other words, it would require Credit Suisse "to be involved in the negotiation of the lease contract and would, in the event of a default, make the bank the adjudicator of the lease

contract . . . and the SBLC would be useless for the purpose for which it's intended." (CA Ex. 82 (e-mail produced from Lasshofer's files); Armitano Decl. ¶ 12.)

46. Neither Lasshofer nor Jackson informed Castle Aero that the condition had to be removed so that the SBLC could be used to obtain line of credit, which Jackson believed would be used to set up a MTN trading program, the profits of which would fund Castle Aero's leasing transaction. (2014 Jackson Aff. ¶ 52.)

47. Because Castle Aero was led to believe that Lasshofer and Innovatis were to act as impartial trustees—that is, they were there to ensure the SBLC would not be used improperly—and the SBLC was only a security deposit under the final lease agreement (which Innovatis was required to hold until closing under the provisions of the Term Sheet), Castle Aero followed Lasshofer's and Jackson's instructions. (Armitano Decl. ¶ 13-14.)

48. The parties agreed on the language of the SBLC by August 9, 2010 (CA Ex. 91), and the SBLC issued on August 11, 2010. (CA Ex. 93.) Lasshofer, however, had already pledged the SBLC several days earlier, obtaining a US$3.6 million line of credit from LLB on August 6, 2010. (CA Ex. 89.)

49. Castle Aero was never informed that Lasshofer had taken possession of the SBLC or that he had used the SBLC in August 2010 to obtain a credit line from LLB. (Adwar Decl. ¶ 6; Armitano Decl. ¶ 15.)

50. Jackson too was kept in the dark. Lasshofer never informed Jackson that he had used the SBLC and never told him what happened to the funds. (2014 Jackson Aff. ¶ 53.) As of August 2010, Jackson had not authorized Lasshofer to draw on or use the SBLC

in any way.  (Id.)

51.     Lasshofer's use of the SBLC violated the conditions of the Term Sheet and the proposed final definitive lease was contrary to repeated representations made to Castle Aero about the purpose of the SBLC and was contrary to the agreement he had with Jackson that the SBLC could only be used if Jackson authorized that use.

### C.     MFS and Castle Aero Fail to Agree on the Final Definitive Lease.

52.     After execution of the Term Sheet, Jackson and Castle Aero began negotiating the final definitive lease.  (CA Ex. 190-92; Adwar Decl. ¶ 7.)

53.     Castle Aero timely made all required payments under the Term Sheet, including an advance retainer for attorney's fees for MFS's counsel, Lane Powell, to draft the proposed final definitive lease agreement.  (Adwar Decl. ¶ 7.)

54.     On or about August 11, 2010, while the parties were still negotiating the terms of the final definitive lease, Credit Suisse provided the SBLC in the required amount of US$4 million.  The SBLC had an expiration date of September 28, 2011.  (CA Ex. 93.)

55.     Consistent with the Term Sheet, the proposed lease agreement provided that the SBLC could only be drawn on if two necessary conditions were met:  (a) closing of the lease transaction; and (b) an uncured default under the executed lease agreement.  (CA Exs. 190-92.)

56.     The proposed final definitive lease specifically stated that the SBLC was to act as a security deposit and could only be used by the lessor if Castle Aero materially defaulted during the term of the lease.  (Id.)  Notably, Innovatis was not the lessor or even a party to

the proposed final lease.

57.    No lease was ever executed.  Thus, Castle Aero could not have breached the lease and the use of the SBLC was not triggered.

### D.    Lasshofer Fraudulently Used Castle Aero's SBLC to Obtain Loans from LLB.

58.    The representations made to Castle Aero that the SBLC would be used only if Castle Aero materially defaulted under the final definitive lease were false and deceptive.

59.    Lasshofer knowingly and intentionally participated in the dissemination of false and misleading information concerning the use of the SBLC.

60.    Lasshofer failed to disclose the manner in which he was going to fraudulently use the SBLC to obtain approximately US$3.6 million in funds from LLB by pledging Castle Aero's US$4 million SBLC as collateral.  (CA Exs. 89, 151-56;170-71.)  Further, Lasshofer failed to disclose, and has continued to fail to disclose, what has become of all the money. (Id.)

61.    Unbeknownst to Castle Aero at the time, Lasshofer fraudulently pledged the SBLC to obtain approximately US$3.6 million from LLB in August 2010—even before the Castle Aero SBLC was issued.  (2014 Jackson Aff. ¶ 52.)

62.    Lasshofer knew that he had no right to pledge the SBLC to obtain credit from LLB, that the only purpose of the SBLC was to act as security against a default by Castle Aero under the final definitive lease, and that Castle Aero had no knowledge that the SBLC was being used in this manner.

16

63.     At no point did Lasshofer inform Castle Aero that the SBLC would be used as a pledge of collateral to obtain credit from LLB.

64.     Rather, Castle Aero reasonably believed the SBLC could only be used to cure a material default in the event Castle Aero failed to meet its obligations under the final definitive lease.   If Castle Aero had known that Innovatis and Lasshofer intended to fraudulently use the SBLC to secure credit from LLB or any other bank, Castle Aero would not have authorized the SBLC or even pursued the proposed transaction.

65.     Lasshofer has used this type of scheme on several other occasions.  Lasshofer pledged bank guarantees on other MFS leasing transactions, like the SBLC here, to obtain bank loans.  (2014 Jackson Aff. ¶¶ 33-34.)  Although the accounts were purportedly set up on Jackson's behalf, Lasshofer never provided Jackson with any accounting statements or kept Jackson apprised of what he was doing with the funds.  (Id.)

66.     Lasshofer was involved in a similar fraudulent scheme in Colorado, where the federal court in Colorado issued a US$185 million default judgment against Lasshofer in a fraudulent real-estate-development scheme.  Niemi v. Burgess, Civil No. 12-869 (D. Colo.) (Docket No. 226).  In that case, as in this one, the alleged front-man for the con, now serving a fifteen-year federal criminal sentence, said that he was only following Lasshofer's instructions, while Lasshofer claimed to be an innocent investor duped by a con man.  Niemi v. Lasshofer, 728 F.3d 1252, 1254 (10th Cir. 2013).

**E.      Castle Aero Terminates Negotiations and Requests that the SBLC Be Cancelled or Released.**

67.      Throughout the proposed transaction, Castle Aero provided the documentation that the proposed final definitive lease required to proceed with the transaction, such as proof of insurance, obtaining legal opinions, and so on.  (CA Ex. 194.)

68.      Castle Aero also paid the fees and costs required of the transaction including to:  Alpha Capital Services (US$35,000), GP Global Finance (US$10,000), Lane Powell (US$40,000), MFS (US$35,000), and Maples & Calder (US$2,000).  (CA Ex. 194; Adwar Decl. ¶ 7; 2014 Castillo Decl. ¶ 8.)

69.      Before closing the transaction, however, material issues arose with the structure of the transaction and the proposed financing.  As a result, on December 9, 2010, Castle Aero notified MFS's counsel that it was terminating the transaction because the terms, conditions, and structure of the transaction were unacceptable.  (CA Ex. 120; Adwar Decl. ¶ 9.)

70.      Thus, as of December 9, 2010, Castle Aero terminated the negotiations.  The final definitive lease, as contemplated by the Term Sheet, was never executed, financing was never provided, and the parties' business relationship ended.  (Adwar Decl. ¶ 9; 2014 Castillo Decl. ¶ 17.)  Shortly thereafter, Castle Aero requested that MFS return or release the SBLC.  (Armitano Decl. ¶ 17; Pentenero Decl. ¶ 15; see also CA Ex. 131 (July 7, 2011, letter from Castle Aero's counsel to MFS's counsel).)

71.      In seeking return or cancellation of the SBLC, Castle Aero repeatedly advised Lasshofer that the transaction had been canceled before the definitive final lease was

executed.  As a result, Castle Aero advised Lasshofer that because the transaction never closed, there was no need or requirement for a security deposit and, by definition, no longer any possible exposure under the SBLC.  (CA Ex. 142-44.)

73.     Instead, in September 2011, LLB made a demand for payment on Credit Suisse under the SBLC to repay Lasshofer's debt to LLB.  (2014 Castillo Decl. ¶ 20.)

74.     Lasshofer fraudulently pledged the SBLC to secure credit from LLB.  He defaulted on the credit facilities, thereby prompting LLB to demand repayment under the fraudulently pledged SBLC.  Lasshofer's use of LLB's credit for his own purposes was not authorized by the Term Sheet, the proposed final definitive lease, Castle Aero, or Jackson.

75.     On September 16, 2011, Lasshofer acknowledged that he was in possession of the funds pledged by the SBLC.  At that time, Lasshofer stated that he would "not release funds under the SBLC to MFS or any third party." (Braunschweig Aff. Ex. 4.)  But by that time, there were no funds for him to release—he owed LLB more than US$7,029,088, had another US$900,000 line of credit coming due, and did not have sufficient assets to cover his debt.  (CA Exs. 137; CA Exs. 170-72.)

     **F.     The Legal Proceedings in Switzerland.**

76.     LLB initiated legal proceedings in Switzerland for the payment of the SBLC. Lasshofer intervened in that action on the side of LLB and encouraged the Swiss court to enforce the SBLC, essentially so that Lasshofer's personal debt to LLB could be paid off

using Castle Aero's money.  (CA Ex. 189.)

77.     On January 13, 2014, the Swiss court enforced the SBLC and ordered Credit Suisse to pay LLB US$4 million plus 5% interest from October 8, 2011—all of which Castle Aero must pay from the US$4 million it deposited with Credit Suisse to cover the SBLC. (Id. at 28.)

78.     Castle Aero must also pay additional amounts ordered by the Swiss court, including court costs of CHF 60,000, one-third of which is jointly shared between Credit Suisse and Castle Aero, with the other two-thirds to be paid by Castle Aero.  The Swiss court also ordered Credit Suisse and Castle Aero to pay CHF 55,800 to LLB for litigation costs, and Castle Aero was ordered to pay CHF 26,600 to Credit Suisse. (Id.)

79.     The decision of the Swiss court is relevant to the issue of damages in this matter but it does not resolve the central issue in these actions[4]—that is, was Castle Aero induced to provide a US$4 million SBLC by fraudulent means and did Lasshofer fraudulently use the SBLC without permission and for his own use?

---

[4]The Austrian court was faced with a similar situation and determined that the criminal action against Lasshofer should proceed because the issue was whether Castle Aero was misled as to "the true and planned, intended use of" the SBLC.  (CA Ex. 195 at 3.)

## IV.   LASSHOFER'S FRAUDULENT SCHEME WAS DEVISED MORE THAN A YEAR BEFORE CASTLE AERO ENTERED THE PICTURE.

### A.   Jackson Is Introduced to Lasshofer and They Quickly Develop a Business Relationship.

80.    In approximately 2009, Jackson began having discussions with a colleague in the aircraft business about possible ways to structure aircraft leasing/financing transactions. They began discussing the idea of using SBLCs as a form of security deposit for leasing transactions for aircraft. Jackson did not have any prior knowledge of SBLCs or how they were structured but thought his clients would prefer using them over a cash deposit. (2014 Jackson Aff. ¶¶ 11-12.)

81.    Jackson and his colleague also discussed the possibility of using medium-term notes (MTNs) as a possible source of funding for the leasing/financing transactions. (Id. ¶ 13.)

82.    Jackson believed he could gain access to wealthy clients that had US$100 million available that could be "rented." For example, by paying 3% of the funds—that is, US$3 million—Jackson could "rent" US$100 million. The plan was to invest the "rented" money in MTNs, the profits of which would provide an adequate source of funding for the aircraft leasing transactions. (Id. ¶ 14.)

83.    Because Jackson had no knowledge about SBLCs and MTNs, he sought advice from others in the industry. He was ultimately referred to Lasshofer, as someone who was experienced in SBLCs, MTNs, and MTN trading. (Id. ¶ 15.)

21

84.     Jackson immediately began communicating with Lasshofer by e-mail and telephone in late August or September 2009 from Minnesota.  Lasshofer knew that Jackson was conducting business in Minnesota, as he was provided Jackson's contact information when they first were introduced. Additionally, in virtually every e-mail that he sent to Lasshofer, Jackson provided his Minnesota contact information:

> Gerry Jackson
> Marketing and Financial Services, Inc.
> 3116 Girard Avenue South, Suite 206
> Minnesota, MN  55408
> U.S.A.
>
> Telephone: +01-612-822-3580
> Fax: +01-612-216-1010
> URL:  www.mfsaircraft.com.

(Id. ¶ 16; Exs. A-C; see also CA Exs. 3-5.)

85.     From August 2009 until September 2010 (when Jackson left Minnesota for Austria), Lasshofer and Jackson exchanged more than 600 e-mails about the various leasing transactions. (2014 Jackson Aff. ¶ 17; Ex. D (identifying e-mails sent between Lasshofer and Jackson).)  They also communicated frequently by Skype and telephone.  Lasshofer knew Jackson was in Minnesota at the time the conferences were held because they had to factor in the seven-hour time difference between Minnesota and Austria.  (Id. ¶ 17; Ex. E.)

86.     During these discussions, Jackson and Lasshofer discussed Jackson's aircraft leasing business, the business model using SBLCs and MTNs, and the role Lasshofer and his companies would play in assisting with the SBLCs and a MTN trading program.  (Id. ¶ 17.)

87.    Jackson later personally met with Lasshofer more than ten times while he was in Salzburg, Austria. From September 2010 until November 2011, Jackson had frequent, often daily, communications with Lasshofer about various topics, including his aircraft leasing/financing transactions, SBLCs, a MTN trading program, sources of funding, and MTNs in general. (Id. ¶ 18; Ex. D.)

**B.    Jackson Engages Lasshofer to Handle the SBLCs and Act as Jackson's Financial Advisor.**

88.    By September 2009, Jackson started having discussions with Lasshofer about providing investment-related services for Jackson's business, and Lasshofer actively took on that role. By fall 2009, Jackson had engaged Lasshofer to handle the SBLCs and to act as his financial advisor. (Id. ¶ 19.)

89.    In their initial discussions, Jackson explained to Lasshofer his background in the aircraft industry and his aircraft leasing and financing business, MFS. (Id. ¶ 20; CA Ex. 149.) Lasshofer was aware of the nature of MFS's business, as reflected in the many e-mails exchanged between the parties over the course of their business relationship. (2014 Jackson Aff. ¶ 20; CA Exs. 5, 7 at Innovatis (Supp.) 003831, 18-19, 21, 29-31, 35, 40.)

90.    Jackson also sought Lasshofer's advice about the possible use of SBLCs and MTNs as a source of funding for the financing transactions. In particular, Jackson explained that he was contemplating using SBLCs as security deposits for aircraft financing transactions but that he did not know how to structure the SBLCs. (2014 Jackson Aff. ¶ 21.)

91.     Lasshofer explained that he was knowledgeable about SBLCs and knew how to structure them, leading Jackson to believe that he was an expert in that area.  Thereafter, Lasshofer held himself out to be the expert in SBLCs, and Jackson and Lasshofer had hundreds of communications by e-mail, Skype, and conference calls in which he confirmed his expertise in carrying out SBLC transactions.  (Id.)

92.     From the beginning, Lasshofer led Jackson to believe that Jackson had a viable business model to fund the leasing transactions, and Lasshofer even sought to enter into a joint venture with Jackson.  (Id. ¶ 22; CA Exs. 3, 8-11, 17, 20-21, 38, 51-52.)

93.     For example, at the end of August 2009, Lasshofer and Jackson discussed the possibility of providing a US$3.7million SBLC from one of MFS's clients.  With this SBLC, Lasshofer would provide a US$3.1 million loan from one of Innovatis' credit facilities, with US$3 million to remain in an account maintained by Innovatis.  (2014 Jackson Aff. ¶ 22; CA Exs. 1-3.)  Lasshofer represented that he would only ask for 50% of the profits "if the investment model becomes provided from us [Innovatis] and if we do the work of the investment."  (Jackson Aff. Ex. F (Aug. 28, 2009, email from Lasshofer); id. ¶ 22; CA Ex. 3.)  The joint venture was never entered into, likely because Lasshofer rejected Jackson's proposal which would have required Lasshofer to place the US$3.1 million into an account controlled exclusively by MFS, not Lasshofer.  (2014 Jackson Aff. ¶ 22; CA Ex. 4 at Innovatis (Supp.) 003709).)  Although Lasshofer and Jackson did not enter into a joint venture, they continued to work together for the next two years.

94.     In their initial conversations, Jackson also explained to Lasshofer that, through a broker, Martin Gibbins, MFS was going to "rent" US$100 million for a fee from Gibbins' wealthy clients.  Jackson hoped to use those funds to set up a MTN trading program that would generate enough profits to fund the aircraft financing transactions he wanted to enter. (2014 Jackson Aff. ¶ 23.)

95.     Jackson informed Lasshofer that he did not know much about SBLCs, MTNs, and MTN trading, and Lasshofer offered to advise him for a fee, ultimately by sharing in the profits.  After describing his plan for using SBLCs and trading MTNs to fund aircraft leases, Lasshofer told Jackson that it was a good business plan, and that Lasshofer could assist Jackson and provide Jackson access to "rented funds," just like Gibbins.  (Id.; CA Exs. 8, 10, 13.)

96.     A little over a month after their first meeting, Lasshofer told Jackson that he could organize US$100 million in "rented funds" for an 8% annual fee.  When Jackson informed Lasshofer he did not have US$8 million for the annual fee, Lasshofer offered to rent the funds for one to two months at a much lower pro rata rate.  (2014 Jackson Aff. ¶ 24; CA Exs. 8-9.)

97.     Lasshofer admitted during a deposition several years later that there never were any funds available to "rent" because Lasshofer's purported investors "would have never made available moneys or funds for financing an aircraft."  (July 24, 2013, Lasshofer Dep. at 245.)  Lasshofer did not disclose that important fact to Jackson.

98.   Instead, Lasshofer led Jackson to believe that if Lasshofer ran the MTN trading program, the returns on the investment plan would be about 10% to 20% per month, which meant, if Jackson "rented" US$100 million, he could expect US$10 to $20 million in returns per month.  (2014 Jackson Aff. ¶ 25; CA Exs. 11, 102 at MFS 000672.)

99.   Based on Lasshofer's repeated representations, Jackson understood that Lasshofer's MTN trading program run could provide more than enough money to fund MFS's leasing transactions.  Lasshofer never told Jackson otherwise.  If Lasshofer had been honest, Jackson would not have entered into the transactions that he did, including the Castle Aero transaction.  (2014 Jackson Aff. ¶ 25.)

100.   Lasshofer's willingness to draft and negotiate the SBLCs also led Jackson to believe that his business model would work.  Lasshofer agreed to exclusively handle the SBLCs.  (Id. ¶ 26.)

101.   At the time, Jackson believed that Lasshofer wanted to ensure the language in the SBLCs was broad enough so that Lasshofer could obtain lines of credit on Jackson's behalf, which would then supply the up-front money needed to "rent" the funds that would ultimately be used to fund the MTN trading program.  Jackson later learned this was not the case.  (Id. ¶ 26.)

102.   Lasshofer also led Jackson to believe that he was working in Jackson's best interest when he agreed that the SBLCs would not be used unless Jackson gave express written permission.  (Id. ¶ 27; CA Exs. 97-98, 141.)  Jackson did not know that at the same time Lasshofer made that representation, he had already pledged the Castle Aero SBLC,

obtained a US$3.6 million line of credit, and paid himself US$200,000 from those funds. (2014 Jackson Aff. ¶ 27; CA Ex. 171 at 1 (Innovatis (Supp. II) 000283); July 25, 2013, Lasshofer Dep. at 387-88.)

103.    In negotiating the SBLCs, Lasshofer informed Jackson that Innovatis, not MFS, had to be the named beneficiary.  (2014 Jackson Aff. ¶ 28; CA Exs. 7, 22-23, 55.)  Jackson did not understand why Innovatis had to be the beneficiary but relied on Lasshofer's expertise in negotiating and using SBLCs because Jackson had never used them before. (2014 Jackson Aff. ¶ 28; CA Exs. 7, 12, 54-55, 69, 75.)

104.    Lasshofer also told Jackson that the SBLCs could not contain any language tying the SBLCs to the aircraft leasing transactions.  (2014 Jackson Aff.  ¶ 28; CA Exs. 54, 80-81, 109.)  Lasshofer explained that, if such language were included, the banks that were parties to the SBLCs would have to determine whether the lessee actually defaulted on any terms of the agreement before honoring any demand for payment under the SBLCs.  (2014 Jackson Aff. ¶ 28; CA Exs. 29, 109.)  It was Jackson's understanding that the SBLCs must not contain any conditional language or they would be worthless for the purposes Jackson intended to use them.  (Jackson Aff. ¶ 28; CA Exs. 7, 8, 109.)

105.    Lasshofer also knew that the SBLCs were to serve as security deposits in the event a MFS client defaulted on an aircraft leasing/financing agreement.  Jackson specifically discussed this issue with Lasshofer and provided him with the term sheets, lease agreements, and transactional documents for various MFS clients, including the Castle Aero Term Sheet. (2014 Jackson Aff. ¶ 29; CA Exs. 30, 35-36, 40, 85, 106; see also July 24, 2013, Lasshofer

27

Dep. at 194-97.)

106.    When clients began asking what role Lasshofer or Innovatis played in the transactions, Lasshofer agreed that Jackson should say that Lasshofer and Innovatis were to act as a neutral third party to hold the SBLCs until the transactions closed.  (2014 Jackson Aff. ¶ 30; CA Ex. 23.)

107.    Lasshofer also told Jackson to tell clients that Innovatis must be named as the "beneficiary" in the SBLCs because it was the holder of the SBLCs, and Innovatis was named as the "borrower" because that is the usual practice.  (2014 Jackson Aff. ¶ 30.)

108.    Lasshofer also said that Jackson could tell MFS clients that Innovatis was assisting with the financing of the aircraft even though Innovatis was not providing any direct funding.  (Id.)  Lasshofer even offered Jackson a directorship in Innovatis, which Jackson refused.  (Id. ¶ 30; CA Ex. 48.)

109.    The evidence in this case show that MFS, Jackson, and Lasshofer regularly made these types of representations to MFS clients, including Castle Aero.

110.    Lasshofer also knew that MFS clients were being told that Innovatis was being used as an intermediary to negotiate and hold the SBLCs, which was to provide a comfort level to MFS clients that the SBLCs could not be used improperly.  (2014 Jackson Aff. ¶ 31; CA Exs. 28-29.)

111.    MFS clients often had questions or expressed concerns to Lasshofer about the use of the SBLCs.  (2014 Jackson Aff. ¶ 31; CA Exs. 15-16, 24, 26-27, 32-33, 39, 41-47.) Specifically, clients were concerned that the SBLCs would be funded and the funds would

28

be misused.  (CA Ex. 31.)  Because of these concerns, clients were told that Innovatis was there to protect their interests.  (2014 Jackson Aff. ¶ 31.)

112.    Lasshofer received copies of MFS's term sheets and lease agreements with its clients.  (Id.; CA Exs. 30, 35, 106.)  These documents led MFS clients to believe that the SBLCs were to be used as security in the event of a default.  (Id.)  Neither Lasshofer nor Jackson ever informed MFS clients, including Castle Aero, or the banks otherwise.  (2014 Jackson Aff. ¶ 31; CA Exs. 116-17.)

113.    Lasshofer also knew that MFS clients were not informed about the real reason for identifying Innovatis as the "beneficiary" in the SBLCs.  (2014 Jackson Aff. ¶ 32.)

114.    At the time, Jackson believed that Innovatis had to be named as beneficiary so Lasshofer could use the SBLCs as collateral to obtain lines of credit from financial institutions on Jackson's behalf.  These funds would have then been invested or used as seed money to get the MTN trading program up and running, which would ultimately would provide Jackson the funding for the leases.  (Id.)

115.    But Jackson did not know that Lasshofer never intended to help with MFS's business and funding of aircraft leases.  Lasshofer just wanted to gain access to the SBLCs so that he could use them for his own purposes.  (Id.)

116.    For example, Lasshofer pledged the Castle Aero SBLC in August 2010— before it was even finalized—and obtained a US$3.6 million line of credit as well as another US$3 million advance.  (Id. ¶ 33; CA Exs. 151-56, 170-72; July 25, 2013, Lasshofer Dep. at 387-88.)  A month later, Lasshofer obtained an additional US$900,000 line of credit by

pledging a SBLC of another MFS client, Rimal Aviation.  (2014 Jackson Aff. ¶ 35; CA Ex. 172.)  Notably, neither Jackson nor MFS are referenced in the account-opening documents, or are designated as beneficiaries to the LLB accounts purportedly being held on their behalf.  (CA Exs. 151-56.)

117.    At this time, in August 2010, Jackson was in Austria.  But Lasshofer did not inform Jackson that he had obtained these funds, even though Jackson specifically asked Lasshofer if they should have been doing something with the SBLCs.  (2014 Jackson Aff. ¶ 33; CA Ex. 110.)

118.    In August 2011, Lasshofer apparently also received a line of credit from another bank by pledging a US$2.5 million bank guarantee of another MFS client, Banvelca & Company.  Jackson was never given any documentation regarding this line of credit but believes that Lasshofer obtained a US$2.25 million line of credit.  The Banvelca transaction never closed, and Lasshofer has not returned the US$2.5 million bank guarantee despite Jackson's demands that he do so.  (2014 Jackson Aff. ¶ 34; see also CA Ex. 188 at 1 (Lasshofer pledging the proceeds from the payment of Castle Aero's SBLC to pay off the Banvelca bank guarantee).)

119.    Only in January 2011, after the Castle Aero deal fell through, did Jackson first instruct Lasshofer to draw on the Castle Aero SBLC.  (2014 Jackson Aff. ¶ 35; CA Ex. 121.)

120.    Lasshofer did not disclose to Jackson that SBLC had been drawn on months before and that Lasshofer had been using the funds himself.

121.     Instead, Lasshofer later informed Jackson that he had obtained a US$3.2 million line of credit  using the Castle Aero SBLC and that he was purportedly holding those funds for Jackson's benefit.  (2014 Jackson Aff. ¶ 35; Ex. G.)  The line of credit Lasshofer actually secured with the Castle Aero SBLC was $3.6 milion.

122.     In February 2011, Jackson instructed Lasshofer for the first time to draw on the Rimal SBLC.  (2014 Jackson Aff. ¶ 35; CA Ex. 126.)  Lasshofer later told Jackson that he obtained a US$800,000 line of credit for Rimal (2014 Jackson Aff. ¶ 35; Ex. G), but Lasshofer did not disclose that he had done that months before, or that he had also used those funds for his own purposes.  (See, e.g., CA Ex. 172 (LLB account statements showing line of credit was obtained in September 2010).)

123.     Lasshofer therefore obtained lines of credit for over US$6 million using the SBLCs without Jackson's authorization.  From the LLB account statements, which Jackson repeatedly requested and Lasshofer refused to produce (2014 Jackson Aff. ¶ 36; CA Exs. 157-69),  it appears that Lasshofer used the US$6 million with no care or regard as to the true purpose of those funds.

124.     When Jackson asked Lasshofer to draw on the SBLCs, he apparently intended that the lines of credit would be paid back before the SBLCs expired.  Jackson requested that the monies be invested.  Lasshofer told Jackson that such an investment would provide a rate of return of 20% to 30% per year.  (2014 Jackson Aff. ¶¶ 37-38; Exs. H-I.)

125.     Jackson was led to believe that the investments would have generated enough money so that the lines of credit could be paid and the SBLCs could be returned to MFS

clients.  (Id. ¶ 37.)

126.    Alternatively, Jackson requested that Lasshofer invest the proceeds from the SBLCs in the MTN trading program.  They had repeatedly discussed this program, with Lasshofer leading Jackson to believe that it would provide a 10% to 20% return per month on US$100 to $200 million, depending on the amount of funds that was actually "rented." Lasshofer also led Jackson to believe that the funds could easily be invested in MTNs and that the profits would easily pay off the line of credit at LLB, which Jackson believed would have allowed him to release the SBLCs.  (Id. ¶ 38.)

**C.      Lasshofer's Role in Handling the MTN Trading Program.**

127.    At the time the Castle Aero SBLC was issued, MFS did not have any type of written commitment for the funding of the US$22 million airplane leasing transaction. Jackson traveled to Salzburg, Austria, where Lasshofer was located, to begin work on the "rental" of the US$100 million and to set up the MTN trading program.  (Id. ¶ 54; CA Ex. 102.)

128.    One of the possible sources of funding for the leasing transactions was to "rent" US$100 million in funds from a private investor.  Gibbins indicated that he had access to such funds, and Jackson asked Lasshofer to assist in structuring the deal to obtain access to these funds and be the MTN trader for these funds, as Lasshofer had represented he was experienced in trading MTNs.  (2014 Jackson Aff. ¶ 42; CA Exs. 59-60, 107-08, 112-15.)

129.    Gibbins initially represented that he had funds available from a Hong Kong investor, then later stated he had US$100 million available in HSBC in Turkey.  Lasshofer

also told Jackson that he could make funds available at HSBC in Hong Kong (2014 Jackson Aff. ¶ 43; CA Ex. 8), although Lasshofer later admitted that was not true.

130.    After multiple discussions in fall 2010 about the structure of the trading program, Gibbins told Lasshofer and Jackson that the money could not leave Turkey. Lasshofer then proposed trading the MTNs at HSBC in Turkey, the place where the money was apparently located, but Gibbins refused that alternative as well. (2014 Jackson Aff. ¶ 43; Ex. L.) So by late fall 2010, Jackson did not have any committed sources of funding for any leasing transactions (2014 Jackson Aff. ¶ 43; CA Exs. 105, 110-12, 114), including the Castle Aero transaction.  (2014 Jackson Aff. ¶ 55.)

131.    At the time Castle Aero terminated the transaction in December 2010, Jackson still did not have US$22 million to fund the Castle Aero lease.  He had not been able to "rent" any funds or set up a MTN trading program.  He had nothing, and Lasshofer knew that, as he was in constant communication with Jackson.  (Id. ¶ 56.)

132.    Jackson and Lasshofer met shortly after Castle Aero terminated the transaction. Lasshofer repeatedly told Jackson that Castle Aero could not cancel the SBLC.  Lasshofer failed to disclose that he had already used the funds.  (Id. ¶ 58.)

133.    After Gibbins's funding source fell through, Lasshofer told Jackson that he could arrange US$200 million from Swiss investors to "rent" for a fee of US$6 million. By summer 2011, at about the time LLB was requiring Lasshofer to repay his loans, Lasshofer told Jackson that he had secured the Swiss funds.  (Id. ¶¶ 44, 62; CA Exs. 132, 140, 148, 159.)  However, Lasshofer did not provide Jackson with any documentation proving this to

be the case.

134.    Because Lasshofer represented that he had "rented" funds available from Swiss investors to pursue the MTN trading program, Jackson decided to declare Castle Aero in default and have LLB draw on Castle Aero's line of credit.  (2014 Jackson Aff. ¶ 62; CA Ex. 138.)  At the time Jackson made this decision, he believed he had over US$6 million to "rent" the funds—the US$4,339,848.15 that Lasshofer had shown Jackson as the investment in LLB once the Castle Aero SBLC was paid, combined with the US$2.25 million from the Banvelca guarantee.  (2014 Jackson Aff. ¶¶ 60, 62.)

135.    Jackson believed Lasshofer's representations that these Swiss funds could have generated the 10% to 20% return on the MTN trading program, that Jackson would have been able to either fund the open leasing transactions or pay off the lines of credit and return the SBLCs.  (2014 Jackson Aff. ¶ 62; CA Exs. 132, 140, 148).  This did not happen.  (2014 Jackson Aff. ¶ 45.)

136.    Shortly thereafter, Credit Suisse refused to honor the SBLC and pay LLB. Lasshofer then told Jackson that Jackson's purported funds at LLB had been frozen but never explained how or why that happened (id. ¶ 63), leading Jackson to believe that the issue was with the Castle Aero SBLC.  It was not.

137.    Lasshofer did not disclose that LLB had terminated its relationship with Lasshofer on January 21, 2011 (CA Ex. 122),  which had nothing to do with the Castle Aero SBLC.  (CA Ex. 124.)  LLB informed Lasshofer that all his debt had to be paid or LLB would be forced to use the collateral pledged for the loans.  (Id.; see also CA Ex. 128

(informing Lasshofer that he had to be out of LLB by September 30, 2011).)

138.    On August 17, 2011, the US$3.6 million line of credit obtained with Castle Aero's SBLC, plus interest, became due for repayment.  When no payments were made, LLB demanded repayment by no later than August 31, 2011.  (CA Ex. 137.)  LLB also informed Lasshofer that the US$900,000 line of credit obtained with the Rimal SBLC was due on September 23, 2011.  (Id.)

139.    On the same day that Lasshofer received LLB's letter, Lasshofer contacted Jackson.  Lasshofer stated that Jackson had to repay the LLB US$3.6 million line of credit 30 days before the Castle Aero SBLC expired.  (2014 Jackson Aff.  ¶ 61; CA Ex. 136.) Lasshofer knew that the SBLC could not be returned until Lasshofer's debt was repaid—a payment he never intended to make.

140.    Instead, Lasshofer needed Jackson to call Castle Aero in default and urged Jackson to bring the required correspondence showing Castle Aero in default.  (CA Ex. 136.) Two days later, Lasshofer received the default notice.  (CA Ex. 138.)

141.    Lasshofer then asked LLB for additional time, purportedly to gather all the background documentation on the default before calling on the SBLC.  (CA Ex. 139.)  That way, Lasshofer could attempt to cover himself and place the blame on Jackson in the event Castle Aero took action to recover the SBLC.  (See, e.g., CA Ex. 142-43 (telling Castle Aero that Jackson called the default).)

## CONCLUSIONS OF LAW

**I.   INNOVATIS'S FAILURE TO SUBSTITUTE COUNSEL PRECLUDES IT FROM ASSERTING ANY CLAIMS OR DEFENSES IN EITHER ACTION.**

142.   Innovatis's indemnification claim must be dismissed for failure to prosecute. See Fed. R. Civ. P. 41(b) (an involuntary dismissal with prejudice is appropriate "[i]f the plaintiff fails to prosecute or comply with these rules or a court order" and it "operates as an adjudication on the merits").   Default judgment must be entered against Innovatis for its failure to defend.   See Fed. R. Civ. P. 55(a) (a default is warranted "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend").

143.   A dismissal for failure to prosecute and the entry of default are mirror images of one another:   "[d]efault is a failure to defend; failure to prosecute is a plaintiff's default; both a default judgment and a dismissal for failure to prosecute are sanctions for disruptive or dilatory conduct in litigation."   Philips Med. Sys. Int'l B.V. v. Bruetman, 8 F.3d 600, 602 (7th Cir. 1993).

144.   Here, Innovatis voluntarily terminated its counsel on the eve of trial and failed to appoint new counsel.   Innovatis is precluded, as a matter of law, from asserting any claims or defenses when it is not represented by counsel.

145.   "It has been the law for the better part of two centuries…that a corporation may appear in the federal courts only through licensed counsel," Rowland v. Cal. Men's Colony, 506 U.S. 194, 201-02 (1993), and Minnesota law is in accord.   See Cary & Co. v. F.E. Satterlee & Co., 208 N.W. 408, 409 (Minn. 1926) ("[T]he right of a party to a suit in court

to appear in person therein does not entitle him to appear for a corporation, even if he owns all its capital stock for the corporation is a distinct legal entity."). This rule is motivated by ethical and professional considerations: "A non-attorney agent of a corporation is not subject to the ethical standards of the bar and is not subject to court supervision or discipline . . . . To permit a lay individual to appear on behalf of a corporation would be to permit that individual to practice law without a license." Nicollet Restoration v. Turnham, 483 N.W.2d 753, 754 (Minn. 1992).

146.    The Court granted Innovatis's attorneys' motion to withdraw in both actions without substitution of counsel. In the withdrawal papers, Innovatis represented to the Court that it "opted not to retain substitute counsel and not to participate in the upcoming trial under the present circumstances (i.e., with the arrest warrant issued by the United States District Court for the District of Colorado still pending)." (See Castle Aero Action, Mem. in Supp. of Mot. to Withdraw as Counsel Without Substitution (Docket No. 168) at 3.)

147.    Innovatis's position was clear—it deliberately and consciously chose not to appoint counsel in its indemnification action (where counterclaims were also asserted against Innovatis), or in the Castle Aero action.

148.    By doing so, Innovatis has failed to prosecute its indemnification claims, has chosen to not defend against the claims asserted against Innovatis in both actions, and has technically been in default since the withdrawal motion was granted. Ackra Direct Mktg. Corp. v. Fingerhut Corp., 86 F.3d 852, 857 (8th Cir. 1996).

149.    Under Rule 41(b), it is appropriate and necessary to dismiss with prejudice the claims asserted by Innovatis against Jackson and MFS in the indemnification action.

150.    Under Rule 55, default judgment should be entered against Innovatis for its failure to defend against Castle Aero's claims and Jackson and MFS's counterclaims.

## II.   DEFAULT JUDGMENT IS APPROPRIATE AGAINST LASSHOFER AND INNOVATIS FOR VIOLATING COURT ORDERS, CONTUMACIOUS CONDUCT, AND INTENTIONAL DELAYS.

151.    The Court also enters default judgment against both Lasshofer and Innovatis for their willful violations of court orders, contumacious conduct, and deliberate attempts to delay these proceedings.

152.    Under Rule 16(f)(1)(C), a court, either on its own or on motion, may issue any just order for a party's failure to obey a scheduling or other pretrial order.  Similarly, under Rule 55(b)(2), a court may enter default judgment against a party for failing to defend.  And a court always has the inherent authority to manage its docket and the conduct of the parties and sanction a party for this misconduct.

153.    The Eighth Circuit's decision in <u>Ackra</u>, 86 F.3d at 854, is particularly instructive here.

154.    There, like here, defendants were represented by legal counsel for more than two years.  During that period, the defendants delayed the discovery process by failing to respond and to produce relevant documents.  The plaintiff brought three motions to compel; all were granted.  Counsel ultimately withdrew because of a conflict and nonpayment, and no counsel was ever substituted, even for the corporate defendants.  The defendants failed

to comply with court-ordered pretrial requirements.

155.   As a result, the plaintiff moved for default judgment before trial.  The motion was granted.  The defendants appealed and the Eighth Circuit affirmed the default judgment, concluding that the defendants' willful violations of court orders, dilatory conduct in delaying the discovery process, and failure to participate in the action after counsel withdrew provided more than sufficient grounds for default judgment.

156.   Here, it took three court orders, the appointment of a Special Master, and additional months of costly discovery to obtain at least some of the discovery necessary to prosecute the case.  Lasshofer's incalcitrant behavior resulted in more than a year's delay in this case.  He then sought to delay it more by attempting to reopen discovery that had closed months earlier.

157.   When that did not work, Lasshofer sought to postpone trial by asserting that he could not attend trial because another court had issued a bench warrant for his arrest— notably, for his failure to abide by court orders in that action.  Lasshofer did not take action to vacate the bench warrant, instead filing a writ of mandamus with the Eighth Circuit hoping that the trial would be delayed while the parties briefed the issue.

158.   When that did not work, Lasshofer terminated his counsel, failed to comply with pretrial scheduling orders, and did not attend trial.  Under Ackra, default judgment is more than warranted.  See also Hoxworth v. Blinder, Robinson & Co., 980 F.2d 912, 918 (3d Cir. 1992) (citing numerous cases and holding that the failure to attend trial provides sufficient grounds for default judgment under Rule 55).

159.    Although a default judgment means that the allegations in the complaint are taken as true, the Court has carefully considered and weighed the evidence in this matter and finds that the evidence establishes that Lasshofer committed fraud against both Castle Aero and Jackson.

160.    The Court therefore finds that the parties have established, both factually and legally, their claims against Lasshofer, as the following sections demonstrate.

## III.    CASTLE AERO HAS ESTABLISHED, BOTH FACTUALLY AND LEGALLY, THAT DEFAULT SHOULD BE ENTERED AGAINST BOTH LASSHOFER AND INNOVATIS.[5]

### A.    Lasshofer's Misconduct Constitutes Fraud.

#### 1.    Castle Aero has Met the Standard to Establish Lasshofer's Fraud.

161.    Under Minnesota law, the elements of a cause of action for fraud are: (1) there must be a representation; (2) that representation must be false; (3) it must have to do with a past or present fact; (4) that fact must be material; (5) it must be susceptible of knowledge; (6) the representer must know it to be false, or in the alternative, must assert it as of his own knowledge without knowing whether it is true or false; (7) the representer must intend to induce the other person to act, or must intend that the other person is justified in acting on the representation; (8) that person must be so induced to act or so justified in acting; (9) that person's action must be in reliance upon the representation; (10) that person must suffer damage; and (11) that damage must be attributable to the misrepresentation, that is, the

---

[5] This section of the order applies to Castle Aero only and to both actions.

statement must be the proximate cause of the injury.  Davis v. Re-Trac Mfg. Corp., 149

N.W.2d 37, 38-39 (Minn. 1967) (quoting Hanson v. Ford Motor Co., 278 F.2d 586, 591 (8th

Cir.1960)).

162.    Concealment of a material fact can also constitute fraud.  Karlstad State Bank

v. Fritsche, 392 N.W.2d 615, 618 (Minn. Ct. App. 1986).

### 2.    Lasshofer's Material Misrepresentations and Omissions.

163.    Lasshofer (through Jackson) made a number of key misrepresentations that

establish a fraud was committed against Castle Aero.

164.    These misrepresentations include:

- Lasshofer was appointed the intermediary to protect Castle Aero's interests and make sure Jackson did not run off with the funds.

- Lasshofer, not the bank, would ensure there was a default before the SBLC was drawn on.

- The SBLC was a security deposit only payable in the event of a default.

- Lasshofer only holds the SBLC until the loan is closed and the aircraft is delivered.

- Jackson could fund the Castle Aero lease.

165.    Lasshofer also failed to disclose key facts to Castle Aero.  Lasshofer could

have but chose not to disclose that:

- Jackson intended to use Castle Aero's SBLC to obtain a line of credit so that he could "rent" funds that would then be used to fund a trading program, the profits of which would fund Castle Aero's lease.

- The reason why Credit Suisse could not issue and receive Castle Aero's SBLC is because Credit Suisse would not fund its own SBLCs.

- At the time the SBLC was issued, Jackson had no source of funding.

- At the time the SBLC was drawn on, Jackson had no source of funding.

- Lasshofer intended to use Castle Aero's SBLC to obtain a line of credit for his own use.

- Lasshofer wanted no restrictions in the SBLC so that he could use the SBLC as collateral to obtain a line of credit for his own purposes.

- Lasshofer had pledged the Castle Aero SBLC even before it was issued to obtain money that he used for his own use.

166.   These misrepresentations and omissions were material.  If Lasshofer's real role and the purpose of the SBLC had been disclosed, Castle Aero would never have agreed to the deal.

### 3.   Lasshofer had a Duty to Disclose.

167.   In Richfield Bank and Trust Co. v. Sjogren, 244 N.W.2d 648, 650 (Minn. 1976),  the Minnesota Supreme Court noted that nondisclosure in a commercial transaction may constitute fraud.  Before a claim of fraud may be established based on the failure to disclose a certain fact, there must first be a duty, either legal or equitable, that obligates the other party to disclose that fact.  Id.

168.   The bases for requiring disclosure in this case are two-fold:  first, "[o]ne who has special knowledge of material facts to which the other party does not have access may have a duty to disclose these facts to the other party;" and second, "[o]ne who speaks must say enough to prevent his words from misleading the other party.  Id. (citations and quotations omitted).

42

169.    Here, Castle Aero understood that Lasshofer would hold the SBLC until the lease closed.  Lasshofer knew that he was not entitled to use the SBLC and he also knew that Castle Aero believed that the SBLC was required as security in the event Castle Aero defaulted under the to-be-completed lease agreement.  His own words reflect that admission: Castle Aero "does not know that it becomes funded, but just used as security."  (CA Ex. 73.)

170.    Lasshofer had special knowledge of the real purpose for obtaining the SBLC. Lasshofer was obligated to disclose this information but did not.  This case presents one of those instances when a party to a commercial transaction should be held accountable for his failure to disclose.

171.    Lasshofer also knew that Jackson had misrepresented why the reference to the lease transaction had to be removed from the SBLC.

172.    Lasshofer was blind copied on one such communication, in which Jackson told Castle Aero that the restricted SBLC was "ABSOLUTELY NOT ACCEPTABLE" because it made "the bank the adjudicator of the lease contract, which they will not do so they would throw it to a court somewhere and the SBLC would be useless for the purpose for which it's intended."  (CA Ex. 82.)

173.    At best, this communication only tells half the truth.  Although Jackson says the SBLC would be "useless the purpose for which it's intended" (id.),  he fails to disclose the real intent behind the SBLC, which was to pledge the SBLC as security to obtain a line of credit.

174.    The same holds true when Lasshofer requested that Castle Aero remove the restriction, as it was just a further extension of Jackson's prior communications and misrepresentations.

175.    These half-truths constitute fraud.

### 4. Castle Aero Reasonably Relied on the Misrepresentations and Omissions.

176.    The determination of "reasonable reliance" is generally a question of fact for the factfinder.  Nicollet Restoration, Inc. v. City of St. Paul, 533 N.W.2d 845, 848 (Minn. 1995).  Reliance "can be inferred from the conduct of the plaintiff."  Davis v. Re-Trac Mfg. Corp., 149 N.W.2d 37, 39 (Minn. 1967).

177.    Here, Castle Aero reasonably relied on the representations made in the Term Sheet, which included that the SBLC was a security deposit that would only be used during the term of the lease and in the event of a default.

178.    Castle Aero also relied on the representation in the Term Sheet that Lasshofer would hold the SBLC until the lease transaction closed.  Further, Castle Aero relied on the representation that Lasshofer was involved to protect Castle Aero's interests, by ensuring there was a default before the SBLC could be used.

179.    Based on these representations, Castle Aero was justified in believing that the parties were entering into a lease transaction for a legitimate purpose.  Castle Aero had no reason to believe that Lasshofer would use the lease transaction to gain control over Castle Aero's security deposit and use it to pay himself, his bills, and others.

180.    Further, in cases alleging fraud by concealment, reliance can be inferred when, like here, a defendant suppresses material facts, knows that a plaintiff is being induced into an agreement based on incorrect assumptions, and remains silent.

181.    In <u>Watkings v. Lorenz</u>, 264 Minn. 471 (1963), plaintiffs alleged that two defendants committed fraud when they led plaintiffs to believe that a lease agreement contained a five-year option to renew when it did not.  A jury trial was held and both defendants were found liable.

182.    On appeal, the Minnesota Supreme Court noted that one defendant's silent acquiescence would constitute fraud when he knew a party was being induced to enter an agreement under false assumptions:

> Whether [defendant] Hardy was a party to the fraud practiced upon plaintiffs would be dependent upon the jury's determination.  If it believed that he had acquiesced therein by remaining silent while aware that plaintiffs were being induced to enter into the purchase agreement on the assumption that the lease might be extended for an additional 5 years from its expiration date, he would be liable for any damages sustained by them as a result.

<u>Id.</u> at 480; <u>see also</u> <u>Spiess</u>, 41 N.W.2d at 567 ("where representations are made by a party who is presumed to know their truth, reliance thereon will be presumed").

183.    Here, Lasshofer knew Castle Aero was told that the restriction had to be removed—indeed, Lasshofer himself requested that be done.

184.    Lasshofer also knew that the removal of that restriction had nothing to do with whether the bank was the entity to determine whether there was a default.

45

185.    The sole purpose for an unrestricted SBLC was that Lasshofer could use SBLC and obtain a credit line for himself, which he did.

186.    Under the facts in this case, it is appropriate to presume reliance under Watkings and Spiess.

**B.    Lasshofer Not Only Aided and Abetted and Conspired to Commit Fraud, He Orchestrated the Fraud.**

### 1.    Lasshofer Had Actual Knowledge of the Fraud and Actually Directed the Fraudulent Schemes.

187.    To establish common law aiding and abetting, Castle Aero must show that Jackson committed a tort causing injury, Lasshofer knew Jackson's conduct constituted a breach of duty, and Lasshofer substantially assisted Jackson in achieving that breach. Witzman v. Lehrman, Lehrman & Flom, 601 N.W.2d 179, 187 (Minn. 1999).

188.    The Court evaluates the elements of knowledge and substantial assistance in tandem—a greater showing of assistance requires a lesser showing of knowledge. Camp v. Dema, 948 F.2d 455, 459 (8th Cir. 1991).

189.    Lasshofer actively and consciously participated and assisted the fraud committed against Castle Aero. He obtained multiple SBLCs from Jackson's clients that were unrestricted so that they could be used to obtain credit lines.

190.    Lasshofer also did not turn Jackson away when Jackson came to him with his business model. Instead, he led him to believe he had a good business model and actively participated in Jackson's business, taking control of the SBLCs, advising Jackson on various issues, and communicating with banks and clients on Jackson's behalf.

46

191.    Lasshofer not only aided and abetted the fraud, he orchestrated the fraud.  But for Lasshofer's involvement, encouragement, and assistance, Jackson would not have entered into the proposed lease transaction with Castle Aero, and the SBLC would never have been issued.

### 2.    Lasshofer Conspired to Commit Fraud.

192.    Castle Aero has also stated a claim for civil conspiracy because Lasshofer and Jackson agreed to accomplish an unlawful purpose and took concerted actions to achieve that purpose by unlawful means.  Harding v. Ohio Cas. Ins. Co. of Hamilton, Ohio, 41 N.W.2d 818, 824 (Minn. 1950).

193.    Lasshofer actively participated in the plan to use Castle Aero's SBLC, albeit for his own purpose.  Lasshofer knew that Castle Aero believed he was involved to protect Castle Aero's interests, which was not true.

194.    Lasshofer also knew that Castle Aero believed that he would hold the SBLC until the lease closed, and that he would not use it unless Castle Aero defaulted under the lease.

195.    With Jackson providing access to SBLCs and Lasshofer providing the expertise and banking relationships, Lasshofer used multiple SBLCs, including Castle Aero's, to obtain multiple lines of credit that had nothing to do with the underlying leasing transactions.

**C.      Lasshofer Is Liable for Conversion, Civil Theft, und Unjust Enrichment.**

**1.      Lasshofer Unlawfully Converted Castle Aero's Property.**

196.    Under Minnesota law, conversion is "an act of willful interference with [the personal property of another], done, without lawful justification, by which any person entitled thereto is deprived of use and possession." Christensen v. Milbank Ins. Co., 658 N.W.2d 580, 585 (Minn. 2003) (quoting Larson v. Archer-Daniels-Midland Co., 32 N.W.2d 649, 650 (Minn. 1948)).

197.    "Although consent is a defense to conversion, consent through fraud is ineffective.  Thus, the commission of fraud may be sufficient interference with property to support a claim of conversion." Tuaolo v. Want Some Weather, Inc., No. A07-2139, 2008 WL 5136614, at *4 (Minn. Ct. App. Dec. 9, 2008) (quotation omitted).

198.    Here, Lasshofer obtained Castle Aero's US$4 million SBLC by fraud.  He was required to hold the SBLC and only use it if there was a default of the leasing agreement.

199.    Instead, he used the SBLC for his own purpose, obtaining over US$6 million from LLB by pledging Castle Aero's SBLC as collateral.  He had no right to use the SBLC in this manner and has deprived Castle Aero of US$4 million of its money.

**2.      Lasshofer Swindled Castle Aero Out of the US$4 Million SBLC.**

200.    Lasshofer is liable for civil theft under Minn. Stat. § 604.14, subd. 1, which provides in relevant part:

> **Liability for theft of property**. A person who steals personal property from another is civilly liable to the owner of the property for its value when stolen plus punitive damages of either $50 or up to 100 percent of its value when

stolen, whichever is greater.

201.    Although "a criminal complaint, conviction, or guilty plea is not a prerequisite to liability" for civil theft, Minn. Stat. § 604.14, subd. 4, courts rely on the criminal theft statute to determine whether a defendant's conduct amounted to theft.  See Popp Telcom, Inc. v. Am. Sharecom, Inc., Civ. No. 96-1177, 2003 WL 1610789, at *9 (D. Minn. Mar. 20, 2003) (Ericksen, J.), aff'd, 361 F.3d 482 (8th Cir. 2004).

202.    A wide range of conduct amounts to theft, including obtaining "the possession, custody, or title to property . . . by intentionally deceiving" a person with a "false representation which is known to be false," Minn. Stat. § 609.52, subd. 2(3), or "swindling, whether by artifice, trick, device, or any other means."  Minn. Stat. § 609.52, subd. 2(4).

203.    A victim's receipt of something of value is not a defense to a claim of civil theft, as the Minnesota Supreme Court has made clear:

> A man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value. It may be impossible to measure his loss by the gross scales available to a court, but he has suffered a wrong; he has lost his chance to bargain with the facts before him.  That is the evil against which the statute is directed.

Minnesota v. Lone, 361 N.W.2d 854, 860 (Minn. 1985) (citation omitted).  Even if such a defense existed, however, Castle Aero did not receive anything of value in exchange for the SBLC Lasshofer stole.

204.    "[T]he gist of the offense is the cheating and defrauding of another by deliberate artifice," and "[n]o single definition can cover the range of possibilities for the

offense." <u>Minnesota v. Ruffin</u>, 158 N.W.2d 202, 205 (Minn. 1968).

205.    It also makes no difference who actually made the misrepresentation:  liability for theft by swindle extends beyond those who make the misrepresentations.  Persons acting in concert with those who make the misrepresentations are also liable.  <u>Minnesota v. Kramer</u>, 441 N.W.2d 502, 507 (Minn. Ct. App. 1989).

206.    Substantial (and uncontroverted) evidence establishes that a number of misrepresentations were made to induce Castle Aero to enter into the Term Sheet and provide the US$4 million SBLC.

207.    It was repeatedly misrepresented that the SBLC was a security deposit that would only be used in the event of a default.

208.    It was misrepresented that Lasshofer would act as an impartial guarantor, ensuring that the SBLC was not improperly used.

209.    Castle Aero was swindled out of the SBLC, which Lasshofer used to obtain over US$6 million in funds from LLB.  He is civilly liable for US$4 million (the value at the time the property was stolen).

210.    In addition, after LLB sought payment under the SBLC, Lasshofer continued to hide the fact that he had pledged the SBLC and obtained $3.6 million that he had not paid back.  Notably, upon being contacted by Castle Aero in September 2011, Lasshofer denied any knowledge of the events and continued to refer Castle Aero to Jackson.  Lasshofer also represented that Castle Aero was in default, even though he knew in December 2010 that the deal had been cancelled and that Jackson had no money to fund the lease in any event.  (CA

Exs. 142-45; Braunschweig Aff. Ex. 4.)

211.    These actions show that Lasshofer was trying to buy time so that Credit Suisse would pay the SBLC to LLB, Lasshofer's debt to LLB would be satisfied, and he could proceed with his fraudulent activities without Castle Aero's interference.

### 3.    Lasshofer Unjustly Used Castle Aero's US$4 Million SBLC to Pay Himself and Other Personal Debts.

212.    To prevail on a claim of unjust enrichment, a plaintiff must show that a defendant knowingly received something of value that it was not entitled to, and that it would be unjust for the defendant to keep those benefits.  Guinness Import Co. v. Mark VII Distribs., Inc., 153 F.3d 607, 613 (8th Cir. 1998) (citation omitted).

213.    "Unjust" may mean illegal or unlawful, or simply that it would be morally wrong to allow a defendant to enrich itself at a plaintiff's expense.  Gallinger v. N. Star Hosp. Mut. Assur., Ltd., 64 F.3d 422, 426 (8th Cir. 1995).

214.    It is undisputed that Lasshofer pledged the SBLC even before it was issued. He obtained not only a US$3.6 million line of credit but also a multimillion dollar advance.

215.    He used the funds with impunity, paying himself, attorneys to get him out of other criminal and civil messes, and other business debts.

216.    Lasshofer has been unjustly enriched by his illegal and wrongful conduct and should be held accountable.

**D.      Lasshofer Is Personally Liable for the Tortious Conduct.**

217.     Lasshofer cannot escape liability by contending that Innovatis committed a tort. An individual that completely controls a corporation, like Lasshofer did here, and takes part in the corporation's commission of a tort, is personally liable for that misconduct. Ellingson v. World Amusement Serv. Ass'n, 222 N.W. 335, 339 (Minn. 1928); see also Universal Lending Corp. v. Wirth Cos., 392 N.W.2d 322, 326 (Minn. Ct. App. 1986) (noting that officer may be liable for corporation's conversion of another's property if the officer actively participated in the tortious transaction).

218.     Innovatis has no employees. (July 22, 2013, Lasshofer Dep. at 11-12.) The evidence establishes that Lasshofer is the only authorized signatory of Innovatis, holding a commercial power of attorney (id. at 12; CA Ex. 193), and makes Innovatis's investment decisions and all other decisions for Innovatis. (July 22, 2013, Lasshofer Dep. at 17; July 25, 2013, Lasshofer Dep. at 289.) Lasshofer alone managed and handled the business affairs of Innovatis and was involved in the fraudulent scheme in these actions.

219.     Lasshofer directed, orchestrated, and committed the tortious conduct. He participated in the transaction and took part in the torts committed in Innovatis's name. There is no difference between Innovatis's and Lasshofer's acts—he dictated and conducted Innovatis's trading, entered into agreements and banking relationships on Innovatis's behalf, and handled all other aspects of Innovatis's business. Lasshofer is therefore personally liable for the tortious conduct committed against Castle Aero.

**E.      Castle Aero Is Entitled to Recover US$4,944,999 in Damages for Lasshofer's Fraudulent Misconduct.**

220.    Lasshofer obtained loans from LLB using Castle Aero's SBLC—none of which had anything to do with the leasing transaction with MFS.  The Swiss court has ordered Credit Suisse to honor the Castle Aero SBLC and pay LLB US$4 million, plus 5% interest from October 8, 2011.  Thus, Castle Aero's money will be used to pay off Lasshofer's debts to LLB.  (CA Ex. 189.)  The Swiss court has also ordered Castle Aero to pay substantial court costs and litigation costs, amounting to at least CHF 142,400.

221.    Due to Lasshofer's fraudulent conduct, Castle Aero has been damaged in excess of $4 million.[6]  Castle Aero is also entitled to all other out-of-pocket losses it suffered as result of Lasshofer's fraud, including payments made to:  Lane Powell (US$40,000), MFS (US$35,000), Alpha Capital Services (US$234,999), Maples & Calder (US$2,000), and GP Global Finance (US$10,000).  (CA Ex. 194; Adwar Decl. ¶ 7; 2014 Castillo Decl. ¶ 8; Piloto Decl. ¶ 4.)

222.    Castle Aero is also entitled to recover damages for the inability to use the US$4 million held by Credit Suisse in a non-interest-bearing account since August 2010, which amounts to approximately US$623,000, using a simple 4% annual rate of return.  (2014 Castillo Decl. ¶ 25.)

223.    The Court awards Castle Aero US$4,944,999 in damages.

---

[6] Although Castle Aero also seeks punitive damages of US$4 million, Castle Aero did not seek to amend its pleadings to include a claim for punitive damages, and therefore under Minnesota law punitive damages are unavailable.  Minn. Stat. § 549.191.

## IV.   MFS AND JACKSON HAVE ESTABLISHED THAT DEFAULT SHOULD BE ENTERED AGAINST LASSHOFER AND INNOVATIS.[7]

### A.   Innovatis's Indemnification Claim Fails as a Matter of Law.

224.   Innovatis's indemnification claim is based on: (1) the Confirmation of Receipt of Financial Facilities (Innovatis Action, Compl. Ex. A), and (2) Assumption of Costs for Legal Fees and Expenses. (Id. Ex. B.)  Innovatis's claims fail as a matter of law for several reasons.

225.   Paragraph 1.6 of the Confirmation states that "'MFS' hereby acknowledges that because the above described instruments are for the benefit of themselves that 'MFS' will and does hereby agree to protect and hold harmless 'Innovatis' from any proceedings that may arise from 'MFS' orders to utilize, hypothecate, demand payment on, call due, declare default, or otherwise demand payment of said guarantees." (Id. Ex. A ¶ 1.6.)

226.   MFS did not order Lasshofer to use the Castle Aero SBLC until January 2011, or the Rimal SBLC until February 2011.[8]  Lasshofer (and Innovatis), however, had already used those two SBLCs in August and September 2010, and used those funds for their own purposes.  Paragraph 1.6 does not cover unauthorized actions.

227.   In addition, Innovatis agreed it would use the guarantees "only at the order of 'MFS' in all cases." (Id. ¶ 1.7.)  Innovatis and Lasshofer did not comply with that material

---

[7] This section applies only to the Innovatis Action.

[8] The third guarantee at issue is from Banvelca.  There is no evidence that any of Innovatis's claims are based on costs due on the Banvelca guarantee.

condition.

228.    Innovatis and Lasshofer breached the Confirmation by obtaining the lines of

credit, using the funds for their own purposes, and never informing Jackson as to what they

had done.  They are not entitled to benefit from their wrongdoings.

229.    Finally, Innovatis and Lasshofer agreed on August 30, 2010, that they would

"only hypothecate or otherwise utilize [the Castle Aero and Rimal] SBLC's [sic] with

[MFS's] express written permission."  (CA Ex. 97.)

230.    At the time he signed this agreement, Lasshofer had already pledged the Castle

Aero SBLC, obtained $3.6 million, and paid himself $200,000.  MFS had not given its

express written permission for Lasshofer's actions.  Lasshofer did not disclose these facts to

Jackson.

231.    A party that breaches a material and essential term in the parties' agreement

is not entitled to indemnification.

**B.    MFS and Jackson Have Established Their Claims and Are Entitled to Damages.**

232.    MFS and Jackson are entitled to be awarded compensation for the loss of what

it reasonably anticipated from a transaction that was not completed.

233.    MFS and Jackson relied on the representations of Lasshofer that:  (1) he was

experienced in structuring SBLCs and MTNs, (2) he had the expertise to generate positive

returns on investments, (3) using MTNs to fund MFS aircraft leasing transactions was a good

business plan, (4) he could provide a MTN trading program using "rented" funds, (5) he

could provide "rented" funds, and (6) the MTN trading program would generate 10% to 20%

returns per month and that other investments could generate returns of 20% to 30% per year.

234.    Lasshofer made these statements to induce Jackson to turn over millions in SBLCs, so that Lasshofer could use the funds obtained by pledging the SBLCs for his use.

235.    Neither MFS nor Jackson ever received any statements detailing the status of these alleged accounts and have not received any returns on these investments.

236.    MFS and Jackson have suffered damages as a result of their reliance on Innovatis's and Lasshofer's representations.

237.    Jackson relied on Lasshofer's representations before entering into agreements with MFS clients.  He would not have done so without Lasshofer's involvement and encouragement.

238.    Lasshofer acted as Jackson's investment advisor, negotiator of SBLCs, asset manager, and middleman to investors with money to rent.

239.    Lasshofer led Jackson to believe that a MTN trading program could generate the returns required to fund MFS's aircraft leasing and financing transactions—that is, sufficient funds would be available so that MFS could complete the transaction with Castle Aero and other clients.

240.    If the MTN trading program had been established as promised, MFS could have raised US$22 million to close the Castle Aero transaction.

241.    MFS, over 15 years, would have earned US$35,593,599.60 of which US$13,593,599.60 would have been interest.  It would have cost MFS US$6 million to rent the funds thereby reducing the gross income to US$7,593,599.60.

56

242.   A reasonable method to obtain a present value is to reduce the interest by 25% or US$3,398,400.00.  That figure reduces the damages to US$4,195,199.60.

243.   MFS and Jackson received $400,000 from Innovatis, reducing the amount of damages to US$3,795,199.60.  (See June 14, 2014, Jackson Damages Aff. (Innovatis Action Docket No. 86) ¶ 6.)

244.   The Court awards MFS and Jackson US$3,795,199.60 in damages.

## ORDER FOR JUDGMENT

Accordingly, **IT IS HEREBY ORDERED that**:

1.   Castle Aero Florida International, Inc.'s Motion for Default Judgment (Docket No. 182 in Civ. No. 11-2672) is **GRANTED**;

2.   Castle Aero Florida International, Inc., Marketing and Financial Services, Inc. and Gerry Jackson's Motion to Dismiss for Lack of Prosecution and for Default Judgment (Docket No. 78 in Civ. No. 12-1818) is **GRANTED**.

3.   Consistent with the Findings of Fact and Conclusions of Law the Court has found that Castle Aero has been damaged by the actions of Innovatis Asset Management, S.A., and Erwin Lasshofer in the amount of US$4,944,999.

4.      Consistent with the Findings of Fact and Conclusions of Law the Court has found that Marketing and Financial Services, Inc. and Gerry Jackson have been damaged by the actions of Innovatis Asset Management, S.A., and Erwin Lasshofer in the amount of US$3,795,199.60.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: <u>July 2, 2014</u>

<u>*s/ Paul A. Magnuson*</u>
Paul A. Magnuson
United States District Court Judge